**BEFORE THE FINANCIAL INDUSTRY REGULATORY AUTHORITY**

---------------------------------------------------------------X

*In the matter of the arbitration between,*

GEORGE WILSON, individually and on behalf of the GEORGE WILSON IRA, JANICE ALMELEH, DELUVINA LOPEZ, ALAN BULOTSKY and TOBY BULOTSKY, individually and as Trustees of the Toby D. Bulotsky Trust, JEAN WILSON individually and on behalf of the JEAN WILSON IRA, and GRACE LUTHERAN CHURCH FREMONT, OHIO,

FINRA No.: **22-01490**

Claimants,

v.

AGES FINANCIAL SERVICES, LTD.,

Respondent.

---------------------------------------------------------------X

**AMENDED STATEMENT OF CLAIM**

Claimants George Wilson, individually and on behalf of the George Wilson IRA, Janice Almeleh, Deluvina Lopez, Alan Bulotsky and Toby Bulotsky, individually and as Trustees of the Toby D. Bulotsky Trust, Jean Wilson, individually and on behalf of the Jean Wilson IRA, and Grace Lutheran Church Fremont, Ohio, ("Claimants") bring this claim pursuant to the Financial Industry Regulatory Authority ("FINRA") Code of Arbitration Procedure by and through their attorneys, Gana Weinstein LLP, against AGES Financial Services, LTD. ("AGES" or "Respondent").

Claimants bring this arbitration proceeding before FINRA pursuant to the agreement entered into by the parties and under FINRA Rule 12200, which requires a member or an associated person of a member to arbitrate disputes arising out of the associated person or

member's investment related business activities. Claimants are residents of Massachusetts, Arizona, Ohio, and California, and were so at times relevant to this dispute, and request a hearing via Zoom, or in the alternative, in California. Claimants seek damages in an amount presently unknown, but believed to be in excess of $648,000 including benefit of the bargain damages, or alternatively, damages consisting of how a well-managed account would have performed in an amount presently unknown[1], together with interest, punitive damages, attorneys' fees, and all forum fees. Accordingly, Claimants allege, upon information and belief, as follows:

## PARTIES

### I. Claimants

#### *1. George Wilson and the George Wilson IRA*

Claimant George Wilson resides at 1148 Glae Jean Court, Ramona, California 92065 and did so at times relevant to the instant dispute. Claimant Wilson also resided at 9581 Pipilo St., San Diego, California 92129 at times relevant to the instant dispute.

#### *2. Janice Almeleh*

Claimant Janice Almeleh currently resides at 1148 Glae Jean Court, Ramona, California 92065 and did so at times relevant to the instant dispute. Claimant Almeleh also resided at 9581 Pipilo St., San Diego, California 92129 at times relevant to the instant dispute.

#### *3. Deluvina Lopez*

Claimant Deluvina Lopez resides at 3731 N Gila Road, Golden Valley, Arizona 86413 and did so at times relevant to the instant dispute.

#### *4. Alan Bulotsky and Toby Bulotsky, individually and as Trustees of Toby D. Bulotsky Trust*

[1] This amount is based upon an initial assessment of Claimants' investments which were available to Claimants at the time of filing. While the claims focus on the GWG investment, a full review of Claimants' investment histories will be made to identify all of the issues and investments at issue in this matter. Claimants specifically reserve the right to amend the particular securities and the amount of damages at issue.

Claimants Alan and Toby Bulotsky reside at 16 Indian Cove Way, South Easton, Massachusetts 02375 and did so at times relevant to the instant dispute.

***5. Jean Wilson and the Jean Wilson IRA***

Claimant Jean Wilson resides at 12269 Carmel Valley Rd., Unit No. 268, San Diego, California 92130 and did so at times relevant to the instant dispute.

***6. Grace Lutheran Church of Grace Lutheran Church of Fremont, Ohio***

Claimant Grace Lutheran Church of Freemont, Ohio is located at 705 West State Street Fremont, Ohio 43420 and did so at times relevant to the instant dispute.

## II. Respondent

***1. AGES Financial Services, LTD.***

Respondent AGES Financial Services, LTD. is a FINRA registered broker-dealer CRD No. 15427 and SEC-registered at No. 8-32155. AGES's main office location is 444 Washington St., Suite 407, Woburn, Massachusetts, 01801. Consequently, AGES is required to follow the rules and regulations promulgated by FINRA, the SEC, and federal and state securities laws, including California, Arizona, and Massachusetts as well as the firm's own internal compliance policies and procedures in carrying out its securities business.

## INTRODUCTION

Claimants trusted Respondent and Respondent's registered representatives to prudently invest their savings in their best interest. Instead, Respondent and its agents abused Claimants' trust by recommending a speculative non-traded bond issued by GWG Holdings, Inc. ("GWG") – a business that acquired life insurance policies in the secondary market. Respondent approved GWG for sale to investors for the purpose of generating high commissions and fees for the firm without any regard to the risk of the imprudent product.

Respondent's due diligence fell far beneath industry standards. GWG should have been an easy investment to avoid. To begin with, at the time that Respondent and its agents recommended that Claimants invest in GWG, the investment had already been the subject of multiple FINRA investigations that concluded it was an illiquid, high-risk alternative investment, and often unsuitable. In part, FINRA determined that GWG had never been profitable in over ten (10) years of operations. FINRA explained, "GWG's entire business was financed by debt, and its continuing business assumed continued access to its line of credit."

Put differently, GWG had long been stuck in a cycle of raising funds by issuing bonds, losing those funds in its very unprofitable business operations, raising new funds so that it did not default on its existing bonds, and repeating the same losing business operations. Without a drastic change in its business operation, the cycle was bound to collapse. Indeed, in 2019, GWG admitted that the actuarial mortality estimations that it used to value life insurance policies systematically over-valued those life insurance policies when GWG purchased them. Since GWG's business depended on speculating about the value of those assets, the valuation flaw quite predictably resulted in continuing losses.

Moreover, GWG made a grossly irresponsible acquisition of a company called Beneficient Company Group L.P ("Beneficient") in 2018. Although Beneficient had no operating history, GWG's purchase valued Beneficient at over $2 billion more than the book value of Beneficient's tangible and intangible assets. When a company is acquired for more than the book value of its assets, the difference between the purchase price and the assets is typically recorded on the purchaser's balance sheet as a "goodwill" asset, which sometimes reflects the value of "synergies" between the merging companies, or the so-far unrealized value of a promising acquired company. But when GWG recorded over $2 billion of goodwill on its balance sheet, three different auditing

firms quit or refused to stand for reappointment. Meanwhile, the SEC launched an investigation into GWG's investment products' goodwill accounting valuation practices.

Marketing materials GWG provided to broker-dealers for investors failed to convey the substantial risks of the investment and, instead, mislead investors as to the important facts of GWG's business operations. Respondent should not have sold GWG because of its history of business failures, poorly defined business plan, opaque assets, ever-changing accountants, and regulatory problems. Instead of acting in the interests of its clients, Respondent was lured by extremely high commissions and fees to sell GWG and echoed the company's talking points to induce investors to purchase the bonds and renew their existing bonds at maturity. Any business that simply uses new funds to pay prior investors is doomed to collapse, and in April of 2022, GWG entered bankruptcy. GWG's bankruptcy, as shown hereinbelow, was an inevitable result that a reasonable investigation would have revealed.

In sum, Respondent has deprived the Claimants of the benefit of the bargain promised or the ability to generate the reasonable returns they were entitled to had they been invested in a well-managed and diversified portfolio of equities and bonds during the same time period.

## FACTUAL BACKGROUND

### A. GWG Holdings, Inc.

#### 1. The GWG L Bond Offering

GWG was incorporated in 2006. GWG's business focused on the acquisition of life insurance policies in the secondary market. GWG had no significant operating history and was subject to all of the business risks and uncertainties of any brand-new business venture.

Until 2018, GWG's sole business was to borrow money to buy life insurance policies in the secondary market at prices that were less than the face value of the insurance benefits payable upon the death of the insureds. GWG would then hold the policies until maturity and collect the

face value upon the insured's death. GWG was obligated to make premium payments on the policies. GWG's success was dependent upon the insurance proceeds being greater than the cost to purchase, finance, and service the policies.

GWG was sold as a non-traded bond offering. The tangled web of GWG sponsors, affiliates, operating entities, and managers is illustrated in the following graphic:




GWG offered bonds with various terms, maturities, and interest rates. A 2019 prospectus advertised the rates and maturity as follows:

The current interest rates for the L Bonds based on their applicable maturity is set forth in the table below.

| Maturity Term | Interest Rate (%) |
|---|---|
| 2 years | 5.50 |
| 3 years | 6.25 |
| 5 years | 7.50 |
| 7 years | 8.50 |

GWG Prospectus (Sept. 5, 2019). At times, GWG sold bonds with maturities as short as 6 months with a 4.25% rate and for 7 years with a yield as high as 9%. *See* GWG Prospectus (Jun. 3, 2020).

The contours of the GWG bonds are as follows:

- Brokers Earned up to 8% commissions. From GWG's prospectus "The total amount of the selling commissions…in the course of offering and selling L Bonds will not exceed 8.00% of the aggregate gross offering proceeds…." GWG Prospectus (Sept. 5, 2019).

- GWG bonds are callable at the discretion of GWG. This means that GWG can repurchase an L Bond at any time without penalty.

- GWG bonds are inadequately secured. While GWG claims that the L Bonds are secured by an insurance portfolio, in the prospectus, the life insurance policies held by DLP IV and Life Trust "do not serve as direct collateral for the L Bonds" and have been "pledged as direct collateral securing" to other debt obligations senior to L Bond investors.

- GWG bonds are "auto-renewable." Like a magazine subscription, unless an L bond investor gives notice ahead of the maturity date that they wish to redeem their investment, the bond is renewed automatically and replaced with a new one with the same terms and interest rate then being offered by GWG. This feature forces investors to be vigilant as expiration approaches.

- GWG bonds are unlisted. This means the bonds are not tradable on any stock exchange. Because there is no market for the L Bonds there is no way for an investor to regularly gauge the value of an L Bonds or the credit worthiness of GWG based on market sentiment.

- GWG bonds cannot be sold. GWG Holding L bond investors cannot sell the bonds before maturity even if they need liquidity. L Bonds can only be redeemed in the event of insolvency, death, or disability of the investor and there would be a 6% penalty for redemption.

- GWG bonds are not rated. L Bonds were not credit rated by any credit rating agency nor were they insured. The prospectus stated that "Investing in our L Bonds may be considered speculative and involves a high degree of risk, including the risk of losing your entire investment."

As shown below, despite these qualities, many brokers sold GWG L Bonds as being safe, secured, and only slightly riskier than CDs.

**2. GWG Is a Complete Business Failure**

GWG was never successful. In FINRA actions as early as 2013, FINRA stated that GWG "has a limited operating history and has not yet obtained profits through its strategy." *FINRA v. Karen Geiger,* AWC No. 2012033508701 (Jul. 15, 2013). Indeed, GWG "had lost more than $3 million through December 2011." *FINRA v. Jeffrey D. Noard,* Hearing Panel Decision No. 2012034936101 (Jul. 17, 2015).

In addition, any review of GWG's financials would have called into question the company's business model. GWG never had a profitable year of operation. For instance, in 2017 GWG lost over $33 million. The company reported $818 million in assets and $685 million in liabilities and continued to suffer large operating losses that threatened the company with insolvency.

At all times since 2012, GWG needed to issue more L bonds and to encourage investors to "auto-renew" their bonds in order to continue stay afloat. FINRA stated that "GWG's entire business was financed by debt, and its continuing business assumed continued access to its line of credit." *Jeffrey D. Noard,* Hearing Panel Decision No. 2012034936101, pg. 5. GWG warned investors that "***If a significant number of holders of our L Bonds and Seller Trust L Bonds demand repayment of those instruments upon maturity instead of renewing them…we may be forced to liquidate some of our life insurance policies or other assets, which could have a material and adverse impact on our results of operation and financial condition***." GWG Prospectus, pg. 20 (Sept. 5, 2019) (emphasis in original).

By 2019, GWG admitted that the actuarial mortality estimations that the company used to purchase the life insurance policies and their expected returns were flawed. As reported by GWG:

> Historically, the life expectancy inputs were based on the arithmetic average of two independent life expectancy reports…. We had expected to receive approximately $453.8 million cumulative policy benefits as of December 31, 2018, and in fact received $262.1 million. This has resulted in greater than expected premium payments, increasing such expected payments from an expected $235.4 million to $248.3 million.

GWG Prospectus, pg. 29 (Sept. 5, 2019).

GWG admitted that its life insurance policies had generated $191 million less than the company had forecasted and modeled. In other words, GWG generated less than 58% of its anticipated revenue. Accordingly, GWG needed to find a new business line or fail.

On January 18, 2018, GWG filed an 8-K with the SEC announcing a strategic relationship with Beneficient. GWG reported that Beneficient was developing a new business line to provide "mid-to-high net worth individuals trust services and related liquidity products and loans for alternative assets and illiquid funds." GWG also reported that Beneficient was developing "a third business segment, referred to as financial technologies and online platforms, designed to offer clients online financial technologies and platforms for direct access to Beneficient LP's liquidity products and services."

Between August of 2018 and December of 2019, GWG entered a series of transactions with Beneficient where GWG made substantial investments in Beneficient and eventually took control of and consolidated it with GWG. GWG then transferred approximately $359 million in cash to Beneficient and its subsidiaries from funds raised through the sale of L Bonds. Despite all of the foregoing risks described, broker-dealers' sales of L Bonds increased from approximately

$264 million in 2018 to approximately $403 million in 2019 – all to fund a speculative new business with no history.

GWG's acquisition of Beneficient lead to arguable balance sheet gimmicks and regulatory accounting issues that caused the company's reporting to become even more opaque than it had been, leading to GWG's ultimate collapse. As shown below, the Beneficient transaction caused GWG to report that its balance sheet went from under $1.5 billion in assets to over $3.6 billion in a single year.

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
(in thousands, except per share data)

| | December 31, 2019 | December 31, 2018 |
|---|---|---|
| ASSETS | | |
| Cash and cash equivalents | $ 79,073 | $ 114,587 |
| Restricted cash | 20,258 | 10,849 |
| Investment in life insurance policies, at fair value | 796,039 | 747,922 |
| Life insurance policy benefits receivable, net | 23,031 | 16,461 |
| Loan receivables | 232,344 | — |
| Fees receivable | 29,168 | — |
| Financing receivables from affiliates | 67,153 | 184,769 |
| Equity method investments | 1,761 | 360,842 |
| Other assets | 28,374 | 45,437 |
| Goodwill | 2,358,005 | — |
| TOTAL ASSETS | $3,635,206 | $1,480,867 |
| LIABILITIES & STOCKHOLDERS' EQUITY | | |
| LIABILITIES | | |
| Senior credit facility with LNV Corporation | $ 174,390 | $ 148,978 |
| L Bonds | 926,638 | 651,403 |
| Seller Trust L Bonds | 366,892 | 366,892 |
| Other borrowings | 153,086 | — |
| Interest and dividends payable | 16,516 | 18,555 |
| Deferred revenue | 41,444 | — |
| Accounts payable and accrued expenses | 27,836 | 13,981 |
| Deferred tax liability | 57,923 | — |
| TOTAL LIABILITIES | 1,764,725 | 1,199,809 |
| TOTAL STOCKHOLDERS' EQUITY | 600,827 | 281,058 |
| TOTAL LIABILITIES & STOCKHOLDERS' EQUITY | $3,635,206 | $1,480,867 |

GWG significantly improved its balance sheet – on paper. The problem was that over 72% of all of the company's assets are listed as "Goodwill." Goodwill is an inherently speculative asset and represents "the portion of the purchase price that is higher than the sum of the net fair value of all of the assets purchased in the acquisition and the liabilities assumed in the process."[2] Goodwill includes the "value of a company's brand name, solid customer base, good customer relations, good employee relations, and proprietary technology…." *Id.*

However, in this case it is highly speculative how Beneficient's "goodwill" could possibly be worth several billions of dollars. As disclosed by GWG:

> ***Beneficient does not have any operating history for its new business.***…but Beneficient's business plan represents a new phase in its development and Beneficient does not have operating history under its current business plan. Additionally, Beneficient's proposed trust company subsidiaries have no operating history. In general, companies that seek to implement these kinds of business plans present substantial business and financial risks and uncertainties.

GWG Prospectus, pg. 37 (Sept. 5, 2019) (emphasis in original).

Accordingly, by the end of 2019, GWG had over $1.7 billion in debts secured by far less in tangible assets that could be liquidated and sold to creditors upon demand. GWG's acquisition of Beneficient, its complexity and opacity, caused GWG's value and business operations to become extraordinarily speculative and most likely worthless at this time.

The difficulty in figuring out the value of the Beneficient business caused GWG to go through a number of accounting firms because no firm would stand for re-appointment under the circumstances. The 2017 and 2018 annual reports were audited by Baker Tilly Virchow Krause, LLP. When Baker Tilly refused to stand for reappointment, Whitley Penn LLP became GWG's public accountant for its 2019 annual report. When Whitley Penn quit, the firm was replaced by

[2] *Goodwill*, Investopedia (available at: https://www.investopedia.com/terms/g/goodwill.asp)

GWG's audit committee in September of 2020, before hiring Grant Thornton LLP – which then refused to stand for reappointment shortly before GWG's bankruptcy.

"On October 6, 2020, GWG Holdings received a subpoena to produce documents from the…SEC's Division of Enforcement…" The SEC investigation "has primarily related to GWG Holdings' ***investment products, including its L Bonds***, as well as ***various accounting matters***, among them, the consolidation for financial reporting purposes of Beneficient by GWG Holdings, ***goodwill valuation***…" GWG 2020 Annual Report (Nov. 5, 2021) (emphasis added). However, the existence of the SEC investigation into GWG was not disclosed by GWG until over one year later in November of 2021. From October of 2020 through April of 2021, GWG continued to raise ***over $200 million in funds*** through the issuance of L Bonds without disclosing the SEC investigation. GWG admitted that the SEC investigation was material information to investors stating that:

> Regardless of the outcome, the SEC investigation may have an adverse impact on us because of fines, legal costs, other expenses, diversion of management resources, and other factors. The investigation could also result in reputational harm to the Company and may have a material adverse effect on the Company's current and future business activities ***and its ability to raise capital through the sale of L Bonds and equity securities***. As a result, the failure to raise enough capital to meet our cash needs could have a material adverse effect on our operations and the value of our securities.

GWG 2020 Annual Report (Nov. 5, 2021) (emphasis added).

Because of GWG's accounting issues, SEC investigation, and failure to file SEC reports, GWG was forced to discontinue selling L Bonds in April of 2021 when it was unable to timely file its 2020 annual report. GWG missed its annual report and at least the first quarter report in 2021. Furthermore, on August 1, 2021, GWG announced that certain previously issued financial statements including its annual report for the year ended 2019, and the quarterly reports for the

first three quarters of 2020 "should no longer be relied upon." All such reports contained statements concerning GWG's Beneficient investment. The Beneficient transactions caused GWG's true financial situation to be called into serious doubt.

Unable to use new funds to repay old investors, GWG immediately ran into liquidity problems. By August of 2021, GWG pledged its entire portfolio of life insurance policies as collateral for loans to keep GWG afloat. In November of 2021, GWG spun off Beneficient as an independent entity. On January 6, 2022, GWG reported that it lost yet another auditor - Grant Thornton LLP – that stated the firm would not audit the company's 2021 results.

In January 2022, GWG missed a payment of interest and principal due and owed to L Bond holders, and announced its hiring of restructuring counsel. In February of 2022, GWG disclosed that it was unable to continue making payments on the L Bonds. Thereafter, in April of 2022, GWG filed for bankruptcy.

**3. Brokers Mislead Investors On GWG**

GWG's failures were masked by a disinformation campaign by many brokers that sold GWG to retail investors. Brokers utilized false and misleading sales materials, oral representations, and other documents to assure investors that GWG was a safe company whose bonds were backed by strong collateral. The goal of the misleading information was to both increase broker commissions as well as to prevent investors from redeeming their GWG bonds. The communications, both verbal and in writing, painted a rosy picture of GWG and its business.

FINRA has brought numerous actions against brokers and broker-dealers that sold GWG bonds and warned the industry to stop advertising GWG bonds as safe, secured, or low risk investments. These actions include:

- *FINRA v. Jeffrey D. Noard,* Hearing Panel Decision No. 2012034936101 (Jul. 17, 2015)

  - "Noard discounted the risk disclosures in the Prospectus…. he gave little importance to the Prospectus because it, like every other prospectus, contained standard risk disclosures regardless of the nature of the company. In effect, he considered the risk disclosures as nothing more than boilerplate legalese… Noard rashly marginalized the warning that the GWG Debentures were only suitable for investors who could stand to suffer a complete loss, dismissively arguing that this was a trait common to all securities."

- *FINRA v. Center Street Securities, Inc.,* AWC No. 2012034936004 (Jul. 24, 2014)

  - "Center Street, through the actions of multiple registered representatives, made unsuitable recommendations to customers to purchase [more than $3 million in] GWG Renewable Secured Debentures, an illiquid and high-risk alternative investment, in violation of NASD Rule 2310 and FINRA Rules 2111 and 2010."

  - "Center Street distributed marketing materials that falsely stated that 'GWG held $489 million of life insurance policies and that those policies served as collateral for the Debentures were incorrect and misleading.'"

- *FINRA v. Jonathan J. Greenfield,* Order Accepting Offer of Settlement, No. 2012034936501 (Nov. 12, 2015)

  - "Beginning in March 2012, Greenfield emailed between 50 and 75 potential customers…to invite them to a dinner that would include a sales presentation regarding GWG Debentures. In the emails, Greenfield stated that an investment in the Debentures involved 'no fluctuation in principal' and suggested that GWG Debentures were comparable to FDIC-insured certificates of deposit by comparing the interest rates each paid."

  - "Greenfield emailed customer EA and stated in the email that GWG Debentures were a 'very good and safe investment.' Greenfield also claimed that GWG's assets 'consist[ed] of life insurance policies.' The representations made to EA were materially false and misleading and omitted material facts…the life insurance policies purchased by GWG's affiliates were not owned by GWG, but by a trust operated by GWG's subsidiaries and created for the benefit of GWG's senior creditor, not debenture holders."

  - "In May and October 2012, Greenfield emailed customers EA and YSN and falsely represented that GWG had an approximately 4 to 1 asset to debt ratio."

  - "Greenfield described GWG's business model using an 'average case' that greatly simplified and underestimated GWG's costs and implied a 117-153% investment return for GWG."

- *FINRA v. 79 Capital Securities, LLC,* AWC No. 2013035565002 (Jun. 10, 2014)

  - "The posting did not provide a sound basis for evaluating the GWG Debentures…. Second, the posting failed to disclose the substantial risks involved in the

investment. Third, the posting incorrectly stated that the '[u]nderlying investments are a portfolio of life insurance policies purchased in the secondary market' when, in fact…the policies have been pledged as collateral for a separate line of credit.'"

- *FINRA v. Arque Capital, Ltd.,* AWC No. 2012033994701 (Oct. 30, 2014)
  - "Between March 2012 and November 2012, Arque sold a total of approximately $3.53 million of Debentures to approximately 40 investors while providing investors the GWG sales kit containing the misleading brochure."
- *FINRA v. Karen Geiger,* AWC No. 2012033508701 (Jul. 15, 2013).
  - FINRA found that $200,000 investment in GWG representing "20% of their liquid net worth…and approximately 14% of their total net worth…" was unsuitable.
- *FINRA v. Jason Price Lamb,* AWC No. 2012034936003 (Jul. 24, 2014).
  - "As Center Street's CCO, Lamb was responsible for the firm's compliance…"
  - "Functions…[Lamb] Approved certain Debenture purchases by customers, including elderly customers and retirees, whose conservative investment objectives were inconsistent with the speculative nature of the Debentures;"

Many broker-dealers, including Respondent, failed to convey the true magnitude of the risk incurred in investing in GWG and recommended the product to many elderly investors relying on the payments for retirement income. Respondent failed to inform Claimants that GWG:

- had never been profitable since at least 2012;
- bond interest and repayment were entirely dependent on investors renewing their bonds and new investor capital;
- subordinated L bond debt to other senior creditors;
- disclosed that its secondary market life insurance business model was not profitable and that the company needed to change its business model;
- investment in Beneficient was a speculative new business venture without a proven track record and little information about the assets or how the business would repay investors;
- that up to 8% of the investment was paid in commissions; and
- disavowed their SEC filings and was unable to retain their accounting firms.

In sum, no firm should have sold GWG as a safe or even moderate risk investment to any investor, let alone to Claimants. The underlying company was never profitable; the accounting records displayed multiple red flags and its business model was suspect at best.

## B. The Claimants

### 1. George Wilson and the George Wilson IRA

George Wilson is 77 years old and retired. In or around 2010, Mr. Wilson met broker David Escarcega after hearing about his investment prowess. Thereafter, Mr. Wilson was introduced to David Escarcega's brother and AGES broker, Adrian Escarcega. The Escarcegas pitched Mr. Wilson the GWG investment by stating that GWG was a strong, viable, and thriving company with a great business model of investing in life insurance policies, that GWG would be an excellent investment and provide Mr. Wilson with dependable monthly interest payments. It was also represented to Mr. Wilson that any investment in GWG was safer than publicly traded stocks and bonds because the product was not correlated to the public stock market. As a result of the Escarcegas' and AGES' representations, Mr. Wilson invested $158,000[3] into GWG in or around November of 2017. Specifically, Mr. Wilson was never told about GWG's changing business model, nor its financial struggles.

Furthermore, before ever investing in GWG, Mr. Wilson told the Escarcegas that he was only interested in safe and conventional investment products because he was getting older, retired, and was only interested in products that would supplement his retirement income. The Escarcegas stated that they understood Mr. Wilson's investment objectives and recommended an investment

[3] Again, this amount is based upon an initial assessment of a portion of Claimant Wilson's portfolio, which was available to the Claimants at the time of filing. While the claims focus on the GWG investments, other alternative investments would also be at issue. Claimants specifically reserve the right to amend the specific securities/investments at issue and the amount of damages alleged and at issue herein.

in GWG as suitable product to meet Mr. Wilson's investment goals. Lastly, importantly, many of the sales and marketing materials that Mr. Wilson was shown or that he received, falsely conveyed that GWG was a credible, capable, and strong company, while failing to disclose its material risks. As a result of the Escarcegas disastrous GWG recommendations, Mr. Wilson is unable to meet all of his financial responsibilities, including financially assisting an ill and disabled elderly sibling.

**2. Janice Almeleh**

Janice Almeleh is 65 years old and is self-employed as an online retailer. Ms. Almeleh met AGES broker Adrian Escarcega and his brother, David Escarcega through her friend George Wilson. The Escarcegas were aware that Ms. Almeleh had recently sold her rental condo, then primary residence and had available capital to invest. Significantly, Ms. Almeleh had little to no investment knowledge and implicitly trusted the Escarcegas when it came to investing her savings and monies. The Escarcegas represented GWG as a great company that had a substantial amount of money and assets, that he had dozens of investors already invested in the company that were thrilled with its performance, and that the monthly interest payments or distributions paid to investors were "guaranteed". Specifically, the Escarcegas stated that due to GWG's profitability, it would never have a problem making its monthly interest payments, therefore making them "guaranteed".

In addition, before meeting the Escarcegas, Ms. Almeleh had never invested in alternative investments of any kind. Also, before investing in GWG, Ms. Almeleh told the Escarcegas that she was only interested in secure products because she was approaching retirement and desired investments that would supplement her retirement income, while also modestly appreciating in value. The Escarcegas understood Ms. Almeleh's investment objectives and still recommended an investment in GWG as suitable product that would meet her investment goals. In or around mid to

late 2017, Ms. Almeleh invested $75,000 into GWG L bonds and $75,000 into GWG preferred stock. Ms. Almeleh's total investment was $150,000. Finally, many of the sales and marketing materials that Ms. Almeleh was shown or that she received, falsely conveyed that GWG was a credible and strong company, while failing to disclose its serious and material risks.

**3. Deluvina Lopez**

Deluvina Lopez is 80 years old and retired. Ms. Lopez met the broker at issue, Adrian Escarcega in or around early to mid-2017. Thereafter, Mr. Escarcega pitched her an investment in GWG. Specifically, Mr. Escarcega told her that the investment was completely safe and would provide "guaranteed" monthly interest payments, while also appreciating in value. Before investing in GWG, Ms. Lopez told Mr. Escarcega that she was only interested in safe, conventional, and conservative investments that would provide modest retirement income because one of her only sources of income was social security. Ms. Lopez also told Mr. Escarcega that she had only ever invested her monies in stocks, bonds, and mutual funds. Mr. Escarcega understood Ms. Lopez's circumstance and investment objectives, and still recommended an investment in GWG as suitable product that would meet her investment goals. In or around September or October of 2017, Ms. Lopez invested $30,000 into GWG L bonds. Lastly, many of the sales and marketing materials that Ms. Lopez was shown or that she received, falsely conveyed that GWG was a credible and strong company, while failing to disclose its material risks.

**4. Alan Bulotsky and Toby Bulotsky**

Toby Bulotsky is 75 years old and retired. Alan Bulotsky is 78 years old and retired. Before retiring, Mr. Bulotsky was a pediatrician. Currently, Mr. Bulotsky is a volunteer professor at Boston University Medical School. He also volunteers at vaccination centers. Mr. and Mrs. Bulotsky first met AGES broker Edward Gazarian in or around 2009 or 2010 at a different broker-

dealer, Commonwealth Financial Network. They then followed Mr. Gazarian to AGES. Mr. Gazarian sold GWG as a rock-solid company and investment. Mr. Gazarian also stated that the GWG investment would have an elevated interest rate and that the interest payments would be guaranteed. Mr. and Mrs. Bulotsky relied on the foregoing representations to their detriment. Importantly, before investing in GWG, Mr. and Mrs. Bulotsky had no experience investing in alternative products, and had only invested in stocks, bonds, and mutual funds. Also, before investing in GWG, Mr. and Mrs. Bulotsky told Mr. Gazarian that they were only interested in safe and conventional products that would supplement their retirement income. Mr. Gazarian understood these investment objectives and recommended that Mr. and Mrs. Bulotsky and their trusts invest in GWG. To date, Mr. and Mrs. Bulotsky have only received a portion of the original $75,000 that they invested in GWG.

During their relationship with Mr. Gazarian and AGES, Mr. and Mrs. Bulotsky were also recommended another alternative investment – Shopoff, which was pitched as a viable and prudent product that would modestly appreciate in value, while also paying income. As a result of Mr. Gazarian's recommendation, Mr. and Mrs. Bulotsky and their trusts invested $50,000 in Shopoff. Again, to date, Mr. and Mrs. Bulotsky have only received a portion of the original investment amount in Shopoff.

**5. Jean Wilson and the Jean Wilson IRA**

Jean Wilson is 74 years old and works as a Property Director for Windermere Exclusive Properties. Ms. Wilson met the broker at issue, Mr. Adrian Escarcega and his brother, David Escarcega through her ex-husband, George Wilson. In or around mid-2017, the Escarcegas recommended that Ms. Wilson invest in GWG. Specifically, the Escarcegas represented that the GWG investment was safe and secure, and would provide Ms. Wilson with guaranteed monthly

interest payments. The Escarcegas also represented that the GWG investment would appreciate in value and that the company had a great business model of investing in life insurance policies. Ms. Wilson relied on the foregoing statements to her detriment.

Significantly, before investing in GWG, Ms. Wilson told the Escarcegas that she was only interested in safe products because she was approaching retirement and desired investments that would supplement her current and retirement income. The Escarcegas understood Ms. Wilson's investment objectives and still recommended an investment in GWG as suitable product to meet her investment goals. In or around mid-2017, Ms. Wilson invested $85,000 into GWG L bonds. Lastly, many of the sales and marketing materials that Ms. Wilson was shown or that she received, falsely conveyed that GWG was a credible, capable, and strong company, while failing to disclose its material risks.

Furthermore, during her relationship with the Escarcegas, Ms. Wilson was also pitched and recommended other alternative investments, including but not limited to the Franklin BSP Realty Trust. As a result of the Escarcegas and AGES disastrous recommendations, Ms. Wilson had incurred substantial and life-altering losses.

**6. Grace Lutheran Church Fremont, Ohio**

The Grace Lutheran Church in Fremont, Ohio, was founded on March 24, 1892. The church has approximately 1000 members as of 2021. The church became involved with Mr. Alan Ray Druckenmiller from AGES brokerage firm because Mr. Druckenmiller has family ties with the church. Mr. Drukenmiller reached out to the church, and the executive committee for the investment voted and approved an investment of 100,000. The committee noticed something wrong with the investment when their last interest payment was received on 12/16/2021. No more payments were accepted in mid-January, establishing red flags for the church. Mr. Druckenmiller

stated that there was a "six-week process" accounting process occurring. However, this was not the case, and the church investment was now at an incredible loss.

## LEGAL CLAIMS[4]

### POINT I.

### BREACH OF FIDUCIARY DUTY

Under California law, where "[the stockbroker's] recommendations, as invariably followed, were for all practical purposes the controlling factor in the transactions" a fiduciary duty exists. *Duffy v. Cavalier,* 215 Cal. App. 3d 1517, 1532, 264 Cal. Rptr. 740, 750 (1st Dist. 1989). Furthermore, the fiduciary duty exists so long as it is found that Claimants relied on the brokers' judgment and "the distinction between a "sophisticated" investor and an "unsophisticated" one is not controlling" in establishing a fiduciary duty. *Id.* at 1533

Fiduciaries have a duty to furnish information to a beneficiary. "This duty to inform is a constant thread in the relationship between beneficiary and trustee; it entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful." *Bixler v. Central Penn. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1299 (3d Cir. 1993); *See also, Globe Woolen Co. v. Utica Gas and Electric Co.*, 224 N.Y. 483, 121 N.E. 378, 380 (1918) ("A beneficiary, about to plunge into a ruinous course of dealing, may be betrayed by silence as well as by the spoken word."). The duty includes informing the customer of the risks involved in purchasing or selling a particular security and not to misrepresent any fact material to

[4] The legal claims listed herein are not meant to be an exhaustive list of claims but merely illustrative of the types of claims being made in accordance with FINRA requirements to provide a description. Claimants reserve the right to add or amend the legal claims and theories made herein and provide further detail in Claimants' pre-hearing brief.

the transaction. *See Hanly,* 415 F.2d 589*; Cash,* 57 F.R.D. 71; *Shorrock v. Merrill Lynch*, CCH Fed. Sec.L.Rep. P 96,251 (D.Or., Nov. 18, 1977).

Numerous courts around the country have recognized the fiduciary duty that stockbrokers owe to their clients.[5] In addition, FINRA has stated on numerous occasions that "the suitability rule and the concept that a broker's recommendation must be consistent with the customer's best interests are inextricably intertwined." NTM 12-25, Suitability, pg. 3 (Jul. 9, 2012). This means that "a broker makes only those recommendations that are consistent with the customer's best interests prohibits a broker from placing his or her interests ahead of the customer's interests." *Id; see also Raghavan Sathianathan,* Exchange Act Rel. No. 54722, 2006 SEC LEXIS 2572, at *21 (Nov. 8, 2006); *Scott Epstein,* Exchange Act Rel. No. 59328, 2009 SEC LEXIS 217, at *40 n.24 (Jan. 30, 2009) ("In interpreting the suitability rule, we have stated that a [broker's] 'recommendations must be consistent with his customer's best interests.'"); *Dane S. Faber,* 57

[5] *See Mansbach v. Prescott, Ball & Turben,* 598F.2d1017 (6th Cir. 1979) (a securities broker dealer is a fiduciary who owes its customer a high degree of care in transacting business); *Byrley v. Nationwide Life Insurance Co.,* 94 Ohio App. 3d 1 (Erie County 1994) ("broker and a client are in a fiduciary relationship."); *United States v. Wolfson,* 2008 WL 1969730, at *2 (S.D.N.Y. May 5, 2008) ("The essence of the argument is that there is no fiduciary relation between a broker and a customer unless the broker is handling a discretionary account. That is simply not true."); *E.F. Hutton & Co. Inc.,* Exchange Act Release No. 25,887, 41 SEC Docket 413, 418 (July 6, 1988) ("The concept of just and equitable principles of trade embodies basic fiduciary responsibilities…"); *Lipkien v. Krinski,* 182 N.Y.S. 454, 192 A.D. 257, 263 (N.Y. App. Div. 1920) (holding that transferring cash to broker gives rise to fiduciary duty regardless of defendants' claim that they were only clearing broker); *Rolf y. Blyth. Eastman Dillon & Co.,* 570 F.2d 38 (2nd Cir. 1978) (registered representative; as broker for investor, owed investor a fiduciary duty); *Moholt v. Dean Witter Reynolds, Inc.,* 478 F. Supp. 451(D.D.C.1979) (stockbrokers are quasi-fiduciaries and are held to high degree of trustworthiness and fair dealing); *Pachter y. Merrill Lynch. Pierce, Fenner & Johnston. Inc.,* 444 F.Supp. 417 (E.D.N.Y. 1978) (brokerage firm and the account executive assigned to service plaintiff's account were bound, as plaintiff's agents, to exercise "the utmost good faith" toward him); *Thropp v. Bache Halsey Stuart Shields, Inc.,* 650 F.2d 817 (6th Cir. 1981) (as fiduciary, the stockbroker stands in special relationship to client and owes him duty to use reasonable care and to act in good faith); *Leboce. S.A. v. Merrill Lynch. Pierce. Fenner & Johnston, Inc.,* 709 F.2d 605 (9th Cir. 1983) (California law imposes fiduciary obligations on broker where broker, for all practical purposes, controls the account); *Jaksich y. Thomson McKinnon Securities, Inc.,* 582 F. Supp. 485 (S.D.N.Y. 1984) (under New York law, securities brokers maintain fiduciary duties to their customers, and relationship between the two parties is one of principal and agent); *Utah State University of Agriculture and Applied Science y. Sutro & Co.,* 646 P.2d 715 (Utah 1982) (stockbrokers have an especially high degree of care to ascertain the authority of a trnstee dealing with public funds); *E.F. Hutton & Co. y. Weeks,* 166 Ga.App. 443, 304 S.E.2d 420 (Ga. 1983) (a broker's duty to account to its customer is fiduciary in nature, resulting in obligation to exercise the utmost good faith); *Wilder v. Meyer,* 779 F. Supp. 164, 168-69 (S.D. Fla. 1991).

S.E.C. 297, 310, 2004 SEC LEXIS 277, at *23-24 (2004) (stating that a "broker's recommendations must be consistent with his customer's best interests" and are "not suitable merely because the customer acquiesces in [them]"); *Wendell D. Belden,* 56 S.E.C. 496, 503, 2003 SEC LEXIS 1154, at *11 (2003) ("As we have frequently pointed out, a broker's recommendations must be consistent with his customer's best interests.").

Respondent violated their fiduciary duty in multiple ways by: (1) recommending an unsuitable investment; (2) omitting material information and providing false and misleading information to Claimants; (3) breach of duty of loyalty through conflicts of interests and placing personal gain above the interests of the Claimants; and (4) failing to conduct due diligence on the investments recommended.

The foregoing prongs will be discussed in the following sections.

**POINT II.**

**SUITABILITY**

Financial advisers must always make suitable recommendations to their clients and must abide by the suitability rules imposed by FINRA. The scope of these duties is defined in FINRA Rule 2111,[6] also known as the "Suitability Rule," which provides:

> (a) A member or an associated person must have a reasonable basis to believe that a ***recommended transaction or investment strategy involving a security or securities*** is suitable for the customer, based on the information obtained through the reasonable diligence of the member or associated person to ascertain the customer's investment profile. A customer's investment profile includes, but is not limited to, the customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose to the member or associated person in connection with such recommendation.

[6] Formerly FINRA Rule 2310.

*See* FINRA Rule 2111 SUITABILITY (emphasis added); *see also* NYSE Rule 405; *In re Larry Ira Klein,* Exchange Act Release. No. 37835 (Oct. 17, 1996) (a representative may make "only such recommendations as would be consistent with [his customers] financial situations and needs."); *In re James Chase,* Exchange Act Rel. No. 47476 (Mar. 10, 2003), 79 SEC Docket 2892, 2897 ("The SEC concluded that the mere disclosure of risks did not satisfy the suitability duty...[n]ot only must the customer be sufficiently sophisticated to fully understand the risks involved with the investment, the customer also must be able to bear those risks.").

In addition, under FINRA 2090 "Every member shall use reasonable diligence, in regard to the opening and maintenance of every account, to know (and retain) the essential facts concerning every customer and concerning the authority of each person acting on behalf of such customer."

Respondent and its agents violated their suitability obligations to Claimants by: (i) failing to conduct a reasonable basis analysis of the investment strategy recommended, (ii) failing to make customer-specific suitable recommendations, and (iii) over-concentrating Claimants' accounts in alternative investments and private placement investments. Each aspect of the suitability rule is discussed below.

**A. Reasonable Basis and/or Investment Strategy**

FINRA has long held that Rule 2310 "include[s] having a reasonable basis for recommending a particular security or strategy." *See Notice to Members 96-32,* 1996 NASD LEXIS 51, 2 (May 1996); *see also F.J. Kaufman and Co.,* 50 S.E.C. 164, 168 (1989). First, a broker-dealer must determine whether the product or strategy is suitable for any customer, regardless of that customer's wealth, willingness to accept risk, age, education, or other individual characteristics. *See In re F.J.*

*Kaufman and Company of Virginia*, 50 S.E.C. 164 ("A broker-dealer must have an 'adequate and reasonable basis' for any recommendation that he makes.").

Respondent failed to conduct reasonable due diligence on the GWG investment recommended. FINRA has stated that when selling bonds:

> The first step in meeting a firm's sales practice obligations with respect to a bond or bond fund is to ensure that the product being offered is reasonably suitable for investment in general. To make this determination, firms must carefully review and understand the terms and conditions of the product being offered. With individual bonds, for example, the firm must understand the type, term, and yield of the bond; when and if periodic interest payments will be made; if applicable, the conditions under which the issuer may call the bond or the holder may redeem the bond; the credit-worthiness of the issuer; the collateral securing the bond, if any; the costs of the transaction; and any other important features as described in the prospectus.

NTM 04-30: NASD Reminds Firms of Sales Practice Obligations in Sale of Bonds and Bond Funds (Apr. 2004).

FINRA specifically reminded firms in NTM 03-71 that:

> Given the complex nature of NCIs [Alternative Investments] and the potential for customer harm or confusion, members are cautioned to ensure that their sales conduct procedures fully and accurately address any of the special circumstances presented by the sale of NCIs. Additionally, NASD is concerned that investors, particularly retail investors, may not fully understand the risks associated with these products.

FINRA reminded members offering bonds or NCIs, such as GWG, of their obligations to (1) conduct adequate due diligence to understand the features of the product; (2) perform a reasonable-basis suitability analysis; (3) perform customer-specific suitability analysis in connection with any recommended transactions; (4) provide a balanced disclosure of both the risks and rewards associated with the particular product; (5) implement appropriate internal controls; and (6) train registered persons regarding the features, risks, and suitability of these products.

In NTM 12-03: Heightened Supervision of Complex Products, FINRA noted it had previously issued multiple notices such as NTM 03-71, NTM 05-26, and NTM 10-22 with a "consistent theme in these Notices is that the complexity of a product often necessitates more scrutiny and supervision by a firm." *Id.*

FINRA has provided an in-depth notice on how to conduct due diligence. FINRA firms have an "obligation to conduct a reasonable investigation of the issuer and the securities they recommend in offerings…" Notice to Members ("NTM") 10-22: Regulation D Offerings, at 1.[7] FINRA has stated that a brokerage firm has a "special relationship" with a customer "from the fact that in recommending the security, the BD represents to the customer 'that a reasonable investigation has been made and that [its] recommendation rests on the conclusions based on such investigation.'" *Id.* at 3 (*citing Hanly,* 415 F.2d at 597). A brokerage firm "may not rely blindly upon the issuer for information concerning a company," in lieu of conducting its own reasonable investigation. *Id.*at 4 (*citing Everest Securities, Inc. v. US,* 116 F. 3d at 1239 ("reliance on others does not excuse [the respondent's] own lack of investigation").

Indeed, when an issuer seeks to finance a new speculative venture, brokerage firms "must be particularly careful in verifying the issuer's obviously self-serving statements." *Id.* (*citing Everest Securities, Inc.,* 116 F. 3d at 963). Additionally, the SEC and courts recognize that a more thorough investigation is required for "securities issued by smaller companies of recent origin." *Id.* at 3 (*citing Hanly,* 415 F.2d at 597). "The fact that a BD's customers may be sophisticated and knowledgeable does not obviate the duty to investigate." *Id.* at 4.

[7] *See also See Hanly v. SEC,* 415 F.2d 589, 595-96 (2d. Cir. 1969); *SEC v. Great Lake Equities Co.,* 1990 U.S. Dist. LEXIS 19819 at *16-17 (E.D. Mich. 1990); *SEC v. North American Research and Development Corp.,* 424 F.2d 63,84 (2d Cir. 1970); *SEC v. Current Financial Services, Inc.,* 100 F. Supp. 2d 1, 14-15 (D.D.C. 2000); *District Business Conduct Committee for District No. 4 v. Everest Securities, Inc.,* 1994 NASD Discip. Lexis 188 (Sept. 2, 1994), *aff'd,* 52 S.E.C.958, 962-63 (Aug. 26, 1996), *aff'd,* 116 F. 3d 1235 (8th Cir. 1997) (stating that firms are required to exercise a "high degree of care" in investigating and independently verifying an issuer's representations and claims); Securities Act Release No. 4445, 27 Fed. Reg. 1415 (Feb. 2, 1962).

FINRA has defined the following parameters as the *bare minimum* a brokerage firm must document in conducting a reasonable investigation for a Regulation D offering and any subsequent offering for the same issuer:

- the issuer and its management[8];
- the business prospects[9] of the issuer;
- the assets[10] held by or to be acquired by the issuer;
- the claims being made; and
- the intended use of proceeds of the offering
- whether the investor's money is likely to be applied according to the stated use of proceeds
- whether the stated use of proceeds is reasonable in light of the issuer's business purpose and prospects

*Id.* at 5; *see also In Re Brian Prendergast,* 2001 SEC LEXIS 1533 (Aug. 1, 2001); *Legend Merchant Group, Inc.,* NASD No. C10030058 (July 2004); *Shelman Securities, Inc.,* NASD No. C06030013 (Feb. 2004) (private placement memoranda contained material misrepresentations and omissions about use of proceeds in a previous offering). In order to demonstrate the brokerage firm has performed a reasonable investigation, the firm should retain records documenting both the process and results of its investigation. *Id.* at 7. The records should include descriptions of the meetings held of the investigation, tasks performed, documents and other information reviewed, results of the reviews, and the individuals who attended the meetings or conducted the reviews. *Id.*

---

[8] FINRA provides a 13-point list of items a reasonable brokerage firm would review with issuer and its management. *Id.* at 8-9.
[9] FINRA provides a 5-point list of items a reasonable brokerage firm would review with to determine the company's business prospects. *Id.* at 9-10.
[10] FINRA provides a 3-point list of items a reasonable brokerage firm would review with to determine the quality of the company's business assets. *Id.* at 9-10.

It is doubtful that Respondent ever conducted a meaningful investigation into GWG. Hearing GWG's sales pitch from its employees and repeating those claims to investors is not due diligence. In sum, Respondent failed to conduct a reasonable investigation into the qualities and performance of the investments recommended and could not form a reasonable basis for their recommendations and the investment strategy implemented in Claimants' account.

**B. Customer Specific Suitability**

The second dimension of FINRA Rule 2310 requires the broker to have a reasonable basis to believe that the recommendation is suitable for the particular customer based on the customer's investment profile. The investment profile includes items such as: financial situation, tax status, investment objectives, risk tolerance, age, and investment experience. *See* FINRA Rule 2310, Recommendations to Customers (Suitability); *see also In re Larry Ira Klein*, Exchange Act Release. No. 37835 (Oct. 17, 1996) (Brokers may make only such recommendations as would be consistent with the customer's financial situation and needs).

FINRA has also warned that "[a]s investors age, their investment time horizons, goals, risk tolerance and tax status may change…[and] seniors and retirees may have less tolerance for certain types of risk than other investors." NTM 07-43: Senior Investors, pg. 2 (Sept. 2007). FINRA also stated that it would scrutinize "recommendations to seniors…that involve…[p]roducts that have withdrawal penalties or otherwise lack liquidity, such as deferred variable annuities…real estate investments and limited partnerships" *Id.* at 4.

With respect to bonds and bond funds, FINRA has stated that investors often equate bonds with safety. "Purchasers of bonds and bond funds often believe that their principal is safe, they are guaranteed a particular yield on their investment, and bonds are inexpensive to purchase because they do not pay a commission or other acquisition cost on the transaction." NTM 04-30:

NASD Reminds Firms of Sales Practice Obligations in Sale of Bonds and Bond Funds (Apr. 2004). Accordingly, firms are required to make "certain that a particular bond or bond fund is appropriate for a particular customer before recommending it to that customer…" *Id.* When advising clients to purchase a bond the agent(s) must "[p]rovid[e] a balanced disclosure of the risks, costs, and rewards associated with a particular bond or bond fund, especially when selling to retail investors". *Id.*

Further, "in the case of individual bonds, customers should be advised as to the credit risk, or risk of default, associated with a particular issuer, and how that risk might affect the safety of the invested principal." *Id.* In the case of GWG, the company did not have a credit rating and the risk of default was extraordinarily high due to the company's unprofitable business. Yet, Respondent did not accurately convey these risks when presenting GWG to Claimants.

Many brokerage firms claim that such risks are irrelevant if an investor's net worth is sufficient to invest in a security. In other words, a high net worth equates to suitability for investing in high-risk investments. FINRA has stated multiple times that:

> NASD cautions firms against relying too heavily upon a customer's financial status as the basis for recommending particularly risky bonds or bond funds. A customer's net worth alone is not necessarily determinative of whether a particular product is suitable for that investor. ***Certain high-yield, high-risk products may be suitable for recommending to only a very narrow band of investors capable of evaluating and being financially able to bear those risks.***

*Id.* (emphasis added). In NTM 03-71 FINRA also issued a clear warning for firms that qualification does not equate to suitability:

> NASD cautions members against relying too heavily upon a customer's financial status as the basis for recommending NCIs. A customer's net worth alone is not necessarily determinative of whether a particular product is suitable for that investor. Given the unique nature of NCIs, these products may present challenges when it comes to a member's duty to dispense its suitability obligation;

> however, the difficulty in meeting such challenges cannot be considered as a mitigating factor in determining whether members have met their suitability obligations. ***NCIs with particular risks may be suitable for recommendation to only a very narrow band of investors capable of evaluating and being financially able to bear those risks.***

NTM 03-71; (emphasis added). *In re Arthur Joseph Lewis,* SEC Rel. No. 34-297941991 WL 294317 (Oct. 8, 1991) (The fact that a customer, such as Mrs. McGowan, may be wealthy does not provide a basis for recommending risky investments."); *In re Patrick G. Keel,* SEC Rel. No. 34-31716, 1993 WL 12348 (Jan. 11, 1993) (holding same).

FINRA has been very clear that high risk and speculative bonds are not appropriate for ordinary investors and should only be sold to an investor who is fully made aware of the relevant risks of such bonds. Here, Respondent failed to understand Claimants' investment needs and objectives. Instead, Respondent thought only about its own commissions and unsuitably invested Claimants in the highest paying commission products available.

**C. Respondent Recommended an Impermissible Overconcentration in Alterative Investments**

A broker dealer is liable for a claim of unsuitability when it over-concentrates a client's account with a particular investment. *In re Holland,* Exchange Act Release No. 36,621, 60 S.E.C. Docket 2935(Dec. 21, 1995) (good faith immaterial to broker liability). Even if a broker claims a client has agreed to such an overconcentration, a broker's suitability obligations are not absolved. In *Holland*, the SEC concluded:

> Even if we were to accept [the broker's] view that these clients wanted to speculate and were aware of the risks-a conclusion not supported on this record-the Commission has held on many occasions that the test is not whether [the clients] considered the transactions in their account suitable, but whether [the broker] fulfilled the obligation he assumed when he undertook to counsel [them], of making only such recommendations as would be consistent with [their] financial situation and needs.

*Id*. at 736-37 (citing *In re Erdos*, 47 S.E.C. 985, 989 (Nov. 16, 1983)); *see also In re Wickswat*, 50 S.E.C. 785, 786-87 (Nov. 6, 1991).

Here, Respondent recommended investing an impermissibly large percentage of Claimants' portfolios into highly speculative alternative investments. Such concentration levels in Claimants' accounts should have raised "red flags" that the accounts were unsuitable.

**POINT III.**

**RESPONDENT EITHER FRAUDULENTLY OR NEGLIGENTLY MADE MATERIAL MISREPRESENTATIONS AND OMITTED MATERIAL INFORMATION IN THE SALE OF THE INVESTMENTS TO CLAIMANTS**

**A. Federal Securities Law**

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or the mails, or of any facility of any national securities exchange to use or employ, in connection with the purchase or sale of any security, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Securities and Exchange Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors. See 15 U.S.C.S. §78j. The SEC, pursuant to 15 U.S.C.S. §78j, promulgated S.E.C. Rule 10b-5 (codified at 17 C.F.R. § 240.10b-5). In a typical § 78j(b) private action, a plaintiff must prove: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

**B. Arizona Statutory, Common-Law Fraud, and Common Law Negligence**

As herein described, Respondent and its agents violated provisions of the Arizona state securities statutes, including but not limited to the following:

> It is a fraudulent practice and unlawful for a person, in connection with a transaction or transactions within or from this state involving an offer to sell or buy securities, or a sale or purchase of securities, including securities exempted under section 44-1843 or 44-1843.01 and including transactions exempted under section 44-1844, 44-1845 or 44-1850, directly or indirectly to do any of the following:
> 1. Employ any device, scheme or artifice to defraud.
> 2. Make any untrue statement of material fact, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.
> 3. Engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit.

A.R.S. § 44-1991.

Respondent is a control person(s), as such terms are defined by the Arizona Securities Act and is, as such, jointly and severally liable for its agents' fraudulent statements and conduct. A.R.S. § 44-1999. Moreover, there is "presumptive control liability" on those persons who have the power to directly or indirectly control the activities of those persons or entities liable as primary violators of §§ 44-1991. *See*, *E. Vanguard Forex, Ltd. v. Ariz. Corp. Comm'n*, 206 Ariz. 399 (Ariz. Ct. App. 2003). Moreover, pursuant to § 44-2002, Claimants are entitled to "recover the amount of the seller's damages, with interest, taxable court costs and reasonable attorneys' fees."

As described *supra*, Respondent violated these provisions and the common law either fraudulently or negligently.

### C. <u>California Statutory, Common-Law Fraud, and Common Law Negligence</u>

As herein described, Respondent and its agents violated provisions of the California and state securities statutes, including Cal. Corp. Code § 25000 *et seq.,* and California common law fraud.

Under Cal. Corp. Code § 25400

> It is unlawful for any person, directly or indirectly, in this state:
>
> (c) If such person is a broker-dealer or other person selling or offering for sale or purchasing or offering to purchase the security, to induce the purchase or sale of any security by the circulation or dissemination of information to the effect that the price of any such security will or is likely to rise or fall because of market operations of any one or more persons conducted for the purpose of raising or depressing the price of such security.
>
> (d) If such person is a broker-dealer or other person selling or offering for sale or purchasing or offering to purchase the security, to make, for the purpose of inducing the purchase or sale of such security by others, any statement which was, at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, or which omitted to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and which he knew or had reasonable ground to believe was so false or misleading.

Under Cal. Corp. Code § 25401.

It is unlawful for any person, in connection with the offer, sale, or purchase of a security, directly or indirectly, to do any of the following: (a) employ a devise, scheme, or artifice to defraud; (b) make an untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; (c) engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person.

As described *supra*, Respondent violated these provisions and the common law either fraudulently or negligently.

### D. <u>Massachusetts Blue Sky Statute, Common Law Fraud, and Common Law Negligence</u>

Pursuant to Chapter 110A, Section 101 of the Massachusetts Uniform Securities Act ("MUSA"), it is: "…unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly: (1) to employ any device, scheme, or artifice to defraud, (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." M.G.L.A. 110A § 101.

In addition, according to Chapter 110A, Section 410(a)(2) [Civil Liabilities] of MUSA, any person who:

> offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading…is liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at six per cent per year from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at six per cent per year from the date of disposition."

*See* M.G.L.A. 110A § 410(a)(2). Lastly, according to Chapter 110A, Section 410(b) of MUSA, "[e]very person who directly or indirectly controls a seller liable under subsection (a), every partner, officer, or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale, and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller." *See* M.G.L.A. 110A § 410(b). The acts, misrepresentations, and omissions of Respondent and its agent described herein violated Massachusetts's Securities Act,

and Claimants, as a result, were damaged and, therefore, are entitled to their compensatory damages, plus interest at six percent (6%) per annum, costs, and reasonable attorneys' fees, pursuant to M.G.L.A. 110A § 410(a)(2).

**E. <u>Violation of FINRA Rule 2210</u>**

The FINRA Rules require firms to provide only accurate and balanced communications, forecasting, marketing, and demonstrative information to clients. NTM 08-81 reminds members that:

> Sales materials and oral presentations must present a fair and balanced picture regarding both the risks and benefits of investing in these products. FINRA reminds firms that NASD Rule 2210 and IM-2210-1 require firms to ensure that statements are not misleading within the context in which they are made, and that firms must consider the nature of the audience to which the communication is directed…

In addition, FINRA Rule 2210(d)(1) provides:

> (A) All member communications with the public shall be based on principles of fair dealing and good faith, must be fair and balanced, and must provide a sound basis for evaluating the facts in regard to any particular security or type of security, industry, or service. No member may omit any material fact or qualification if the omission, in the light of the context of the material presented, would cause the communications to be misleading.
>
> (D) Communications with the public may not predict or project performance, imply that past performance will recur or make any exaggerated or unwarranted claim, opinion or forecast. A hypothetical illustration of mathematical principles is permitted, provided that it does not predict or project the performance of an investment or investment strategy.

Further, NTM 03-71 provides guidance concerning non-conventional investments stating:

> [M]embers should provide investors with any prospectus and other disclosure material provided by the issuer or the sponsor. NASD reminds members, however, that simply providing a prospectus or offering memoranda does not cure unfair or unbalanced sales or

> promotional materials, whether prepared by the member, sponsor, or issuer.

*See* NTM 03-71. In addition, NTM 10-22 provides that:

> If a private placement memorandum or other offering document presents information that is not fair and balanced or that is misleading, then the BD that assisted in its preparation may be deemed to have violated NASD Rule 2210. Moreover, sales literature concerning a private placement that a BD distributes will generally be deemed to constitute a communication by that BD with the public, whether or not the BD assisted in its preparation.

NTM 10-22 at 5.

**F. <u>Respondent's Fraudulent Misrepresentations and Omissions</u>**

As alleged, Respondent provided false and misleading information to their clients in the sale of securities, management of accounts, and financial planning. As shown above, the representations made to Claimants in various marketing materials and orally were knowingly or recklessly false and misleading and omitted material information. Respondent misrepresented the risks of GWG and qualities of the investments being.

Respondent concealed known losses on Claimants' investments and otherwise attempted to cover losses. Respondent's representations concerning the performance and returns for these investments and the ongoing investment strategy were not balanced and presented to Claimants fairly, an inexperienced investor in this product.

In addition, it is anticipated that Respondent will defend themselves by asserting the "prospectus" defense. This defense asserts that Respondent and its agents are allowed to make false statements and misrepresentations to investors so long as a prospectus is provided. This defense has no merit and seeks to undermine the very purpose of the securities laws. According to the SEC, a person who makes oral misrepresentations to sell a security cannot wash away his liability by handing his victim a prospectus:

> At the expense of restating the obvious, we emphasize that compliance with these requirements for delivery of a prospectus or offering circular does not, however, license broker-dealers or their salesmen to indulge in false or fanciful oral representations to their customers. The anti-fraud provisions of the Securities Act and the Securities Exchange Act apply to all representations whether made orally or in writing, during or after the distribution. We have repeatedly held that the making of representations in the sale of securities unsupported by a reasonable basis is contrary to the obligation of fair dealing imposed on broker-dealers and their salesmen by the securities laws. **This obligation is not diminished because a prospectus or offering circular containing information specified by the Act and our rules has been or is to be delivered. Such information furnishes the background against which the salesman's representations may be tested. Those who sell securities by means of representations inconsistent with it do so at their peril.**

*In the Matter of Ross Secs., Inc.,* SEC Release No. 7069, 41 SEC Docket 509 (Apr. 30, 1963); (emphasis added); *see also In the Matter of the Application of Larry Ira Klein,* SEC Release No. 37835, 63 SEC Docket 52 (Oct. 17, 1996) ("Klein's delivery of a prospectus to Towster does not excuse his failure to fully inform him of the risks of the investment package he proposed"); *Dep't of Enforcement v. Brookstone Sec, Inc.,* Complaint No. 2007011413501, 2015 FINRA Discip. LEXIS 3, at *81 (FINRA NAC Apr. 16, 2015) (rejecting respondents' argument that a broker's misrepresentations are rendered immaterial when written risk disclosures are made available to customers); *Regulation v. Field,* Complaint No. CMS040202, 2008 FINRA Discip. LEXIS 63, at *36 (FINRA NAC Sept. 23,2008) ("[E]ven assuming...that he had sent official statements to each customer prior to the customer's purchase, this does not excuse his fraudulent misrepresentations.").

This point has been made over and over again by FINRA:

> Members are also advised that, although the prospectus and sales material of a fund include disclosures on many matters, **oral representations by sales personnel that contradict the disclosures in the prospectus or sales literature may nullify the**

> **effect of the written disclosures and they make the member liable for rule violation and civil damages** to the customers that result from such oral representations.

NASD Notice to Members 03-71 (emphasis added); NTM 13-18: Guidance on Communications With the Public Concerning Unlisted Real Estate Investment Programs, pg. 2 (May 2013) ("Descriptions of real estate programs in communications need to be consistent with the representations in the program's current prospectus."); NTM 04-30 ("However, NASD reminds firms that simply providing a prospectus does not cure unfair or unbalanced sales or promotional materials, whether prepared by the firm or the issuer."); NTM 05-59 ("Members are further reminded that providing risk disclosures in a prospectus supplement does not cure otherwise deficient disclosure in sales material, even if such sales material is accompanied or preceded by the prospectus supplement.").

As FINRA has found specifically with respect to the sale of GWG:

> In making a recommendation of such a security, a broker may not disregard the issuer's disclosed risks and in their place rely on sales brochures and unsupported positive statements from the issuer's principals. Noard improperly did just that. He failed to present JD with most of the disclosed risks and instead gave her his opinion regarding GWG's long-term prospects.

*FINRA v. Jeffrey D. Noard,* Hearing Panel Decision No. 2012034936101 (Jul. 17, 2015).

## POINT IV.

## RESPONDENT VIOLATED FINRA RULES 2010, IM-2310-2, AND 2020

FINRA Rule 2010 requires members to "observe high standards of commercial honor and just and equitable principles of trade" in conducting their business. FINRA Rule 2020 also prohibits members from effecting "any transaction in, or induce the purchase or sale of, any security by means of any manipulative, deceptive or other fraudulent device or contrivance." IM-

2310-2 - "Fair Dealing with Customers" is cross-referenced by both of the aforementioned provisions and provides a non-exhaustive list of activities that would be inconsistent with the foregoing principals. *See* IM-2310-2: FAIR DEALING WITH CUSTOMERS. The first section of IM-2310-2 outlines member and associated persons obligations in dealing with customers as follows:

> (a)(1) Implicit in all member and registered representative relationships with customers and others is the fundamental responsibility for fair dealing. Sales efforts must therefore be undertaken only on a basis that can be judged as being within the ethical standards of the Association's Rules, with particular emphasis on the requirement to deal fairly with the public.

Respondent egregiously and intentionally violated many of the subsections of IM-2310-2, as discussed *infra*.

**POINT V.**

**FAILURE TO SUPERVISE**

Respondent unreasonably failed to stop inappropriate sales. A broker-dealer owes a duty to all of its customers under FINRA Rule 3010 to properly monitor and supervise its employees.

**A. Supervision Standard**

Respondent failed to supervise their brokers' misconduct. A broker-dealer owes a duty to all of its customers under FINRA Rule 3010 to properly monitor and supervise its employees. FINRA Rule 3010 states:

> Each member shall establish and maintain a system to supervise the activities of each registered representative, registered principal, and other associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable NASD Rules. Final responsibility for proper supervision shall rest with the member…

FINRA Rule 3010: SUPERVISION.

The duty to supervise is a critical component of the securities regulatory scheme. *In re Quest Capital Strategies Inc.,* 1999 WL 202487 (SEC Release No. ID-141). Those who have a duty to supervise have an affirmative responsibility to uphold their duty. *Id.* Regulatory authorities such as the SEC, FINRA and the NYSE have steadily heightened the supervisory obligations of brokerage firms in recent years. Utilizing language employed by the SEC, "effective supervision by a broker/dealer is a critical element in the regulatory scheme and its importance has increased as firms have grown...broker dealers must provide effective staffing, efficient resources, and a system of follow-up and review to determine that any responsibility to supervise…is being diligently exercised." *In Re Mabon Nugen & Co.*, 44 SEC Docket 1116, Release No. 27301 (September 27, 1989).

Evidence tending to establish a variance between conduct called for by a firm's procedures and the actions actually undertaken by an employee of the firm may support a finding of liability. *Rupert v. Clayton Brokerage Co. of St. Louis, Inc.*, 737 P.2d 1106, 111 - 12 (Colo. 1987). Supervisors have an obligation to respond vigorously and with the utmost vigilance to indications of irregularity. A supervisor cannot ignore or disregard red flags and must act decisively to detect and prevent improper activity. Indications of wrongdoing demand inquiry as well as adequate follow up and review. *In re Quest Capital Strategies Inc.,* 1999 WL 202487 (SEC Release No. ID-141). Also, a violation of internal procedures may support a punitive damages award. *Alrich v. Thomson McKinnon Securities, Inc.,* 589 F.Supp. 683, 685 (S.D.N.Y. 1984). Finally, "a court [or other arbiter] may consider evidence of [a] brokerage firm's internal rules as evidence of the proper standard of care." *Thropp v. Bache Halsey Stuart Shields, Inc.*, 650 F.2d 817, 820 (6th Cir. 1981); see *also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*, 697 F.Supp. 1224, 1227 (D.D.C. 1986) (violation of NASD rule was evidence of broker's negligence).

**B. "Control Person" Liability**

Respondent is also liable to Claimants for misconduct under the theory of "control person" liability. Both federal and state securities acts impose "control person" liability on all persons who have the power, direct or indirect, exercised or not, to control another's sale of securities. *See, e.g.*, 15 U.S.C.A. § 78t (2011) (stating "every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable…").

As used in all such securities acts, "the term 'control' . . . means the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 957 (5th Cir. 1981).

Respondent was the "control persons" of their brokers at all times relevant to this dispute. Therefore, Respondent is liable for its brokers' misconduct.

**C. Respondeat Superior**

Respondent is liable to Claimants for all of its brokers' misconduct under the theory of respondeat superior. Courts have held that respondeat superior liability is created by the "special duties that certain employers assume under the federal securities laws when their conduct is likely to a exert a strong influence on important investment decisions." *Sharp v. Coopers & Lybrand,* 649 F.2d 175, 181 (3d Cir. 1981). As also explained by the Fifth Circuit, "most investors rely upon the reputation and prestige of the brokerage firm rather than the individual employees with whom they might deal. Such firms should be held accountable if employees they select utilize the firm's prestige to practice fraud upon the investing public." *Paul F. Newton & Co. v. Texas Commerce*

*Bank,* 630 F.2d 1111, 1119 (5th Cir. 1980); *Henricksen v. Henricksen,* 640 F.2d 880, 887 (7th Cir. 1981) (*cited by Sharp v. Coopers & Lybrand,* 649 F.2d at 182) ("(U)nder common law principles, a principal is liable for the deceit of its agent committed in the very business he was appointed to carry out. This is true even though the latter's specific conduct was carried on without knowledge of the principal.") *see also* Restatement (Second) of Agency § 261 ("A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit fraud upon third persons is subject to liability to such third persons for the fraud"). Similarly, the sixth circuit has emphasized that the broker-dealer has "an affirmative obligation to prevent use of the prestige of its firm to defraud the investing public." *Holloway v. Howerdd,* 536 F.2d 690, 696 (6th Cir. 1976); *As You Sow v. AIG Fin. Advisors, Inc.,* 584 F. Supp. 2d 1034, 1047 (M.D. Tenn. 2008) (*citing See Henricksen v. Henricksen,* 640 F.2d 880, 887 (7th Cir. 1981), *cert denied,* 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 637 (1981); *Alvarado v. Morgan Stanley Dean Witter. Inc.,* 448 F.Supp.2d 333 (D.P.R. 2006); *Carroll v John Hancock Distributors, Inc.,* CIV.A. 92-5907, 1994 WL 87160 at *4 (E.D. Pa. Mar. 14, 1994) ("[U]nder Pennsylvania law a principal is liable to third parties for the frauds, concealments etc. of his agent committed within the scope of his employment even though the principal did not authorize or know of such conduct, even if he forbade such acts.").

Respondent is responsible for all of its brokers' investment related activities. Regardless of whether or not the firm prohibited the brokers' misconduct.

**POINT VI.**

**BREACH OF CONTRACT**

Claimants and Respondent entered into customer agreements in which Respondent agreed, among other things, to comply with all state and federal securities laws as well as FINRA's own

regulations. Claimants complied with the terms of the contract between the parties, as memorialized by the parties, and performed or tendered performance thereunder. Claimants performed all conditions precedent and obligations incident to all of the above-referenced contractual obligations or agreements. Respondent breached the customer agreement with the Claimants by violating FINRA and SEC rules. Respondent also violated their own internal written procedures. Respondent is also a party to various "selling agreements" concerning many of these investments. In addition to Respondent's legal obligation to conduct due diligence, the selling agreements also contractually obligated Respondent to conduct due diligence on the offerings. Claimants are a third-party beneficiary to those selling agreements. Respondent failed to undertake reasonable due diligence into the offerings, breaching the selling agreement to the detriment of Claimants. As a direct and proximate consequence of Respondent's wrongful conduct, Claimants suffered damages.

**POINT VII.**
**DAMAGES**

As a cause and consequence of the Respondent's misconduct in the handling of Claimants' investment funds, Claimants seeks damages consisting in excess of $648,000 including benefit of the bargain damages, or alternatively, damages consisting of what a well-managed account would have performed in an amount presently unknown.

In addition, Arbitrators have the power to award exemplary, or in other words, punitive damages. As the United States Supreme Court held in *Mastrobuono v. Shearson Lehman Hutton. Inc*., 514 U.S. 52 (1995), the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*., grants arbitrators plenary authority to consider and make an award of punitive damages notwithstanding any provision of state law to the contrary.

Here, punitive damages should be assessed against Respondent and are wholly warranted due to the firm's intentional and willful failure to oversee its agents' activities. The callousness to the consequences which Respondent has shown cry out for a remedy that will not only make Claimants whole but prevent a repetition of these events which have become all too commonplace in the industry. Every year millions of investors' funds are squandered or placed in risky high-commission generating strategies that are of no benefit to the investor. Moreover, brokerage firms continually ask for and advertise to induce the public's trust and confidence and the same brokerage firms attempt to run away when the wrongful acts of those they employ are discovered. The perils that investors face when trusting the brokerage industry are fostered through a policy of scant compensation for victims that profits the industry even when brokerage firms fail in their most basic duties.

FINRA firms continue to behave in a way that suggests that a lack of supervision, and the relatively small amounts of damages that result, are merely a cost of doing business to be borne rather than a problem to be corrected. An award that falls short of assessing punitive damages will not take the necessary step of impressing upon Respondent the indisputable need to supervise and manage its employees in accordance with the rules of law and the business ethics of fair trade.

Accordingly, the panel should award punitive damages, interest at the legal rate per annum, as well as attorneys' fees, and costs.

## CONCLUSION

As a result of the conduct set forth above, Claimants requests a final hearing in this matter and that this Panel award damages from Respondent, as follows:

1. Compensatory damages for a sum of at least $648,000 or alternatively, well managed portfolio damages;

2. Statutory damages;

3. Interest at the statutory rate;

4. Attorneys' fees;

5. Expert fees;

6. Forum fees;

7. Punitive damages; and

8. Any and all other relief available to Claimants, in law or equity or otherwise, which may be granted to them by this Arbitration Panel.

Dated: August 25, 2022
New York, NY

Respectfully Submitted,
**GANA WEINSTEIN LLP**

By: ______________________________

Adam J. Gana, Esq.
Adam J. Weinstein, Esq.
Donnell C. Much, Esq.
345 Seventh Avenue
21st Floor
New York, New York 10001
Tel: (212) 776-4252

*Attorneys for Claimants*